STANLEY PETERS *vs.* HAYMARKET LEASING, INC., & another.[1]

No. 04-P-740.

Suffolk. March 7, 2005. - October 17, 2005.

Present: GREENBERG, COWIN, & GREEN, JJ.

*Motor Vehicle,* Entrustment, Agency. *Negligence,* Motor vehicle, Entrustment, Vicarious liability, Duty to prevent harm, Proximate cause, Independent contractor. *Agency,* What constitutes, Scope of authority or employment, Independent contractor. *Taxicab. Massachusetts Port Authority.*

In a negligence action brought by a plaintiff injured by a taxicab against the corporation that had leased the taxicab in question to the driver, the judge erred in granting summary judgment in favor of the corporation, where there was sufficient evidence in the summary judgment record to warrant findings in the plaintiff's favor on claims of negligent entrustment [771-772] and vicarious liability on the theory of respondeat superior [772-776].

In a negligence action brought by a plaintiff injured by a taxicab on property owned by the Massachusetts Port Authority (authority), the judge did not err in granting summary judgment in favor of the authority, where even putting aside the issue whether presentment of the plaintiff's claim was required under G. L. c. 84, § 18 [776-778], the evidence was insufficient to support the plaintiff's claims that the authority was itself negligent [778-779] or vicariously liable for the conduct of the taxicab driver [779-780].

CIVIL ACTION commenced in the Superior Court Department on February 7, 2001.

The case was heard by *Linda E. Giles,* J., on motions for summary judgment, and entry of separate and final judgment was ordered by *Diane M. Kottmyer,* J.

*David J. McDonough* for the plaintiff.

*Carey H. Smith* for Haymarket Leasing, Inc.

*Matthew J. Walko* for Massachusetts Port Authority.

COWIN, J. The plaintiff, Stanley Peters, was struck by a taxi at

---

[1]Massachusetts Port Authority.

Logan Airport, incurring a serious injury as a result. He commenced an action in the Superior Court against Frantz Fenelus, the driver of the taxi,[2] and Haymarket Leasing, Inc. (Haymarket), a corporation that had leased the taxi in question to Fenelus. By amendment to the complaint, Massachusetts Port Authority (the authority) was added as a party-defendant. Motions for summary judgment filed by Haymarket and the authority were allowed. A subsequent joint motion of the plaintiff, Haymarket, and the authority for entry of separate and final judgments, see Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), was also allowed, and the plaintiff's appeal brings the case to this court. We conclude that the plaintiff offered evidence sufficient to avoid summary judgment in favor of Haymarket on theories of negligent entrustment and vicarious liability by means of a principal-agent relationship, and therefore reverse the judgment in favor of Haymarket. We affirm the judgment in favor of the authority.

1. *Background.* Viewing the evidence in the light most favorable to the plaintiff, the following material facts were established for purposes of summary judgment. On or about December 12, 2000, Fenelus received his hackney driver's license. Approximately three days later, he entered into a week-to-week lease with Haymarket for use of its taxicab bearing Boston medallion number 827. Haymarket pledged that the medallion was not subject to adverse claims, suits, or judgments, and promised to pay renewal fees, tax stamps, and other license fees. The company also agreed to provide liability insurance, but only the minimum amount required by statute. The vehicle bore the name "Haymarket Leasing, Inc." on both sides.

In return, Fenelus agreed to pay to Haymarket $75 for each daytime shift in which he used the vehicle and $83 for each nighttime shift. He was not required to account to Haymarket for fares at shift-end, "except that he [would] turn over to [Haymarket] . . . any records required to be kept by any laws, ordinances and regulations pertaining to the operation of a taxi." The taxi was also to be returned at the end of each shift. Fenelus agreed to bear responsibility for tolls and costs of fuel; to report accidents and related occurrences promptly to Hay-

[2]Fenelus is not a party to this appeal.

market's insurance agent; to cooperate in investigating and defending any accident claims; to adhere to the rules and regulations of the Hackney Bureau; to pay costs arising from violations of any governmental regulations; and to pay all taxes arising from his operation of the taxi.

The precise relationship that the parties sought to create nevertheless remained obscure. One provision of the agreement stated that Fenelus intended to become Haymarket's independent contractor. The document was also styled as a lease. By the time of the agreement between Fenelus and Haymarket, the police commissioner of the city of Boston had, however, prohibited the leasing of taxicabs by regulation.[3] In an apparently uninformed reference to this limitation, another clause of the lease stated that the agreement would "automatically terminate" if such a rule came into effect.

In any event, Fenelus and Haymarket commenced performance pursuant to the agreement. Haymarket delivered the taxi to Fenelus and Fenelus began picking up passengers. To facilitate the effort, the taxi was furnished with a two-way radio. If Fenelus had known how to use it, he could have received dispatches from Haymarket, which the agreement provided he could accept or ignore at his pleasure. However, he did not know how to use the radio and did not receive any dispatch instructions. Instead, Fenelus boarded many of his fares from taxi stands at area hotels. He also twice went to Logan Airport, the second time being around 6:00 A.M. on December 22, 2000.

As was required of all taxi drivers entering Logan Airport,[4] Fenelus proceeded first to a large asphalt staging area called the

---

[3]Rule 65, § 2, of the Rules and Regulations of the Police Department of the City of Boston for Hackney Carriages, was made part of the summary judgment record and states in pertinent part:

> "The leasing or renting of taxicabs by licensed owners is expressly forbidden, and any infraction of this rule shall be considered sufficient grounds for revocation of the owner's hackney carriage set-up license and medallion."

[4]The "Massport Taxi Operating Guide" provides in pertinent part: "All licensed Boston taxis seeking fares at Logan Airport, must report to the Massport taxi pool." There was evidence presented that noncompliance was punishable with a fine.

taxi pool. To gain entry to the taxi pool, a hackney driver would submit to inspection by an authority employee and insert a token into an automatic gate.[5] The driver would receive a numbered receipt. Once inside, the driver would enter a parking lane until a signal board flashed the number printed on the receipt. The area was configured so that there were two adjacent parking lanes, then a travel lane, then repeats of the configuration. Once the number flashed on the signal board, the taxi could then proceed to an airport terminal. Taxis were also free to leave the airport at any time. The posted speed limit in the taxi pool was five miles per hour, although drivers often sped and were infrequently cited. After driving into the taxi pool, Fenelus entered a lane and waited.

The plaintiff was also in the taxi pool that morning. He was a semi-retired hackney driver who occasionally drove his son's taxi. Once inside the taxi pool, the plaintiff idled for a time and spoke with a friend who was driving another taxi. He then decided to walk across the taxi pool for a cup of coffee. As the plaintiff crossed a travel lane, he heard a squeal of tires and caught a glimpse of the shadow of a taxi pulling out of a waiting lane. In an instant, he was struck, sustaining a serious leg fracture. The vehicle that hit him was subsequently determined to be Haymarket's taxi, with Fenelus at the wheel. Fenelus was cited for speeding.[6]

The plaintiff's second amended complaint contained eleven counts. The first was a claim of ordinary negligence asserted against Fenelus, a claim not at issue in this appeal. Counts two through five asserted claims against Haymarket, specifically alleging negligence (count 2); negligent entrustment (count 3); vicarious liability because of an agency relationship with Fenelus (count 4); and breach of a nondelegable duty of an owner of a taxi medallion (count 5). The plaintiff included six counts against the authority, specifically asserting negligence (count 6); breach of duty by a public franchisee (count 7); failure to warn (count 8); negligent design or maintenance (count 9); failure to exercise control of an independent contractor with reasonable care (count 10); and negligent entrustment

---

[5]Thirteen tokens could be purchased for $20.

[6]After appealing the citation, Fenelus was assessed a fine of $25.

(count 11). Counts 8, 9, and 11 were waived by agreement. The plaintiff did not give notice of his injury to the authority pursuant to G. L. c. 84, § 18.[7]

2. *Claims of error as to Haymarket.* The plaintiff asserts that the entry of summary judgment in favor of Haymarket was error. The essence of his argument is that there was sufficient evidence in the summary judgment record to warrant findings in his favor on theories of negligent entrustment (count 3) and vicarious liability (counts 4 and 5), and that therefore he was entitled to a trial on those claims.

We examine first the count alleging negligent entrustment. A party seeking summary judgment "bears the burden of proving that there are no material issues of fact and that he is entitled to judgment as a matter of law." *Highlands Ins. Co.* v. *Aerovox, Inc.*, 424 Mass. 226, 232 (1997). "Where the moving party does not bear the burden of proof at trial, 'this burden . . . may be satisfied by demonstrating that proof of that element is unlikely to be forthcoming at trial.' " *Ibid.*, quoting from *Flesner* v. *Technical Communications Corp.*, 410 Mass. 805, 809 (1991). It is axiomatic that the moving party cannot meet its burden by silence. See *Community Natl. Bank* v. *Dawes*, 369 Mass. 550, 554 (1976).

Where negligent entrustment of a motor vehicle is alleged, a plaintiff must first demonstrate that the defendant had control of the vehicle in question. See *Salamone* v. *Riczker*, 32 Mass. App. Ct. 429, 431 (1992). Liability on a theory of negligent entrustment "is predicated on the owner's having entrusted a vehicle to a person who was incompetent or unfit to use it properly, whose incompetence or unfitness was the cause of the injury to the plaintiff. The general rule in Massachusetts is that the entrustor, to be liable, must have had actual knowledge of the unfitness of the entrustee (as contrasted with mere reason to know that the entrustee was unfit or incompetent)." *Mitchell* v. *Hastings & Koch Enterprises, Inc.*, 38 Mass. App. Ct. 271, 276-277 (1995).

---

[7]General Laws c. 84, § 18, as amended by St. 1965, c. 378, § 1, states in pertinent part that one injured by a defect in the ways must within thirty days of injury give the governmental entity that is "obliged to keep said way in repair, notice of the name and place of residence of the person injured, and the time, place and cause of said injury or damage."

Applying these principles, we conclude that Haymarket has not established that the summary judgment record lacks evidence sufficient to make out a case that it negligently entrusted the taxi to Fenelus. There is no question that Haymarket controlled the vehicle that was subject to the lease agreement. There was evidence that Fenelus had had two automobile accidents and two moving violations prior to entering into his agreement with Haymarket, and the jury could conclude therefrom that he was an unfit driver. See *id.* at 277. Actual knowledge on Haymarket's part may be more difficult to show. Nevertheless, Fenelus was licensed to operate taxis for only three days before entering into the lease. In addition, the lease itself was unlawful by operation of rule 65, § 2. Drawing all reasonable inferences in favor of the nonmoving party, we conclude that the plaintiff made a showing that, if credited and depending on the weight assigned to it by a fact finder, Fenelus was incompetent to operate a taxi at an acceptable level and that Haymarket knew of his deficiencies.

In contrast, Haymarket has not addressed the issue at all. It offered no evidence to rebut the plaintiff's evidence on the subject (which probably would only have resulted in creation of disputed factual issues for trial).[8] Suffice it to say, the plaintiff's evidence that Haymarket was negligent in entrusting the vehicle to Fenelus, while perhaps modest, precluded Haymarket from being able to demonstrate that evidence on the issue was unlikely to be forthcoming at trial, and summary judgment in its favor was consequently improper.

We turn to the plaintiff's claim that Haymarket is vicariously liable for his injury under agency principles, and begin by disposing of two theories that, in our view, do not avail the plaintiff on this record. The plaintiff contends that Haymarket is vicariously liable because the lease that it entered into with Fenelus was prohibited by applicable regulations. See note 3, *supra.* However, the plaintiff has offered no authority for the

---

[8]For example, Haymarket offered no evidence regarding the requirements for obtaining a hackney driver's license or of any reasonable belief it may have had that satisfaction of these requirements indicated that the operator was competent.

proposition that an unlawful lease per se subjects the lessor to liability for the actions of the lessee.[9] Thus, summary judgment on this theory (embraced in count 5) was proper.

The plaintiff also asserts, as part of his agency claim in count 4, that Fenelus possessed apparent authority to act for Haymarket, thereby giving rise to vicarious liability on Haymarket's part for Fenelus's acts within the scope of that authority. In support of this proposition, he offers evidence that the name "Haymarket Leasing, Inc." was displayed on both sides of the taxi leased by Haymarket to Fenelus.

The plaintiff's proffer lacks essential elements. Apparent authority does not come into being until a third party "learns facts from which he reasonably infers that the agent is authorized." Restatement (Second) of Agency § 27 comment b (1958). See *id.* at § 8 comment c (apparent agency does not exist until the third person believes the agent to be authorized). The principal ordinarily is liable only where detrimental reliance is also shown. See *Hudson* v. *Massachusetts Property Ins. Underwriting Assn.*, 386 Mass. 450, 457 (1982); Restatement (Second) of Agency § 219(2)(d). The evidence here is insufficient on both elements, there being no evidence either that the plaintiff saw the lettering on the sides of the taxi before he was struck or that he relied on it in any way. Consequently, summary judgment was appropriate on this theory as well.

The plaintiff fares better in his contention that Haymarket is vicariously liable because Fenelus operated the taxi as an agent subject to Haymarket's control. See Restatement (Second) of Agency §§ 216 comment a, 219(1). We take this to be an argument for the application of the doctrine of respondeat superior.

The existence of a master-servant relationship is ordinarily a question of fact. See *National Assn. of Govt. Employees* v. *Labor Relations Commn.*, 59 Mass. App. Ct. 471, 474 (2003); Restatement (Second) of Agency § 220(1). There are a number of factors that are relevant, see Restatement (Second) of Agency

---

[9] We observe that the Restatement (Second) of Torts § 428 (1965), discussed *infra*, contemplates recovery on similar facts, but the plaintiff did not seek recovery on that ground against this defendant. We accordingly regard the argument as waived.

§ 220(2), all of which are oriented toward determining whether an individual's conduct was subject to the principal's control or right of control.[10] "The label placed by the parties on their relations is not dispositive, and subterfuges are not countenanced." *S.G. Borello & Sons* v. *Department of Industrial Relations*, 48 Cal. 3d 341, 349 (1989). It is the right to control, as opposed to actual control, that is determinative. See *Dias* v. *Brigham Med. Assocs.*, 438 Mass. 317, 322-323 & n.8 (2002). Even a very attenuated right of control may give rise to an employment relationship. See *id.* at 322; Restatement (Second) of Agency § 220 comment d. This is particularly true in the case of a taxi driver, who tends to enjoy a high degree of independence even within a traditional employer-employee relationship. See, e.g., *Air Terminal Cab, Inc.* v. *United States*, 478 F.2d 575, 580 (8th Cir. 1973).

While the record in the present case is sparse, we are satisfied that there is sufficient evidence of the right of Haymarket to control Fenelus that summary judgment on the claim in count 4 should not have been granted. Haymarket's purported surrender of control was ineffective because the lease agreement violated Boston police department rule 65, § 2, and thus, by operation of the lease's termination clause, see note 3, *supra*, was void from the outset. There was evidence as well that Haymarket required Fenelus to submit reports compliant with ap-

---

[10]The following matters of fact are considered, among others:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business."

Restatement (Second) of Agency § 220(2).

plicable law at the end of each shift.[11],[12] Fenelus was also required to return the taxi to Haymarket after each shift. In addition, Haymarket's ability to control Fenelus was enhanced by the fact that the agreement could be terminated in any week.

We observe that several other factors suggest that Haymarket retained a right of control. Haymarket provided all of the instrumentalities of Fenelus's work, including the vehicle and meter, medallion, and liability insurance. Haymarket's name was prominently displayed on the front doors of the taxi; Fenelus was obliged to aid Haymarket in defending against claims; and Haymarket contemplated issuing nonbinding radio dispatches to Fenelus.

There was, of course, countervailing evidence.[13] On its face, the agreement between the parties appeared to relinquish Haymarket's right to direct Fenelus. In addition, evidence showed that Fenelus could not be dispatched by radio. Other factors might also militate against vicarious liability, such as the method of payment (Fenelus paid Haymarket for use of the taxi) and the apparent intention of the parties that Fenelus remain an independent contractor or a lessee. The conflicting evidence

[11]The applicable regulation, rule 65, § 23, of the Rules and Regulations of the Police Department of the City of Boston for Hackney Carriages, states in pertinent part: "Every licensed driver must keep a record of all trips made . . . which record shall be kept by the owner of the licensed hackney carriage . . . ." The general rule in Massachusetts is that "[c]ourts do not take judicial notice of regulations; they must be put in evidence." *Passanessi* v. *C.J. Maney Co.,* 340 Mass. 599, 604 (1960). Cf. G. L. c. 30A, § 6 (requiring judicial notice of only those regulations published in the Code of Massachusetts Regulations). The plaintiff did not offer § 23 in evidence, and the rule itself plays no part in our decision. However, the lease terms are in evidence, including the requirement that Fenelus turn over to Haymarket records pertaining to the operation of a taxi that are required by law.

[12]We are not persuaded by the view of certain jurisdictions that control mandated by law has little weight in the master-servant analysis. See, e.g., *Local 777, Democratic Union Org. Comm., Seafarers Intl. Union of N. America, AFL-CIO* v. *National Labor Relations Bd.,* 603 F.2d 862, 875-877 (D.C. Cir. 1979); *Hanson* v. *Transportation General, Inc.,* 245 Conn. 613, 624 (1998). That the right to control is a product of a regulatory requirement does not make it any less a right to control.

[13]Haymarket's proffer eliminates any presumption of liability that may arise by operation of G. L. c. 231, § 85A. See *Cheek* v. *Econo-Car Rental Sys. of Boston, Inc.,* 393 Mass. 660, 662-663 (1985); *Thompson* v. *Auto Credit Rehabilitation Corp.,* 56 Mass. App. Ct. 1, 5 (2002).

precludes summary judgment. It is a question for trial whether Haymarket employed Fenelus and, "having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it," should bear the costs of Fenelus's conduct. See Prosser & Keeton, Torts § 69, at 500-501 (5th ed. 1984).

All that need be observed at this point is that the plaintiff has produced sufficient evidence for a fair minded finder of fact to conclude that Fenelus was subject to at least an attenuated right of control by Haymarket when he operated the taxicab. See *Flesner* v. *Technical Communications Corp.*, 410 Mass. at 809, quoting from *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). We are in harmony with the conclusions of a majority of other courts in reaching this result. See *Nelson* v. *Yellow Cab Co.*, 349 S.C. 589, 595 (2002) (collecting cases); *Purvis* v. *Porter Cabs, Inc.*, 38 Va. App. 760, 772-773 (2002) (same).

3. *Claims of error as to the authority.* The plaintiff also challenges the allowance of summary judgment in favor of the authority. He asserts that his suit was not subject to presentment; that the authority's failure to enforce its speed limit in the taxi pool with reasonable vigor was negligence that caused a foreseeable injury; and that the authority was vicariously liable for negligence arising from the operation of Fenelus's taxi based on theories regarding public franchisees and control over an independent contractor. We consider these arguments in turn.

We are not content to decide the claim on the sole basis of lack of presentment because we are not convinced that it is the type of claim to which the requirement of presentment applies. General Laws c. 84, § 15, provides that "a person [who] sustains bodily injury or damage in his property by reason of a defect or a want of repair . . . in or upon a way" may recover damages therefor from a county, city, town or person "by law obliged to repair the same." The statute applies to the authority's airport properties. See St. 1956, c. 465, § 23. "A person so injured shall, within thirty days thereafter, give . . . notice of the name and place of residence of the person injured, and the time, place and cause of said injury or damage." G. L. c. 84, § 18, as amended by St. 1965, c. 378, § 1. Presentment to a government authority is mandatory for claims of injury or dam-

age caused by "anything in the state or condition of [a publicly maintained] way that renders it unsafe or inconvenient for ordinary travel." *Gallant* v. *City of Worcester*, 383 Mass. 707, 710-711 (1981).

There is no question that the plaintiff's allegation of negligence on the part of the authority (count 6) arose from his injury on what was a publicly maintained way within the meaning of G. L. c. 84, § 15. Cf. *Polonsky* v. *Massachusetts Port Authy.*, 60 Mass. App. Ct. 922, 923 (2004) (parking area at airport not a "way"; "no suggestion that the area was used as a travel lane"). However, it is not the location of the injury, but rather the plaintiff's theory of liability, that renders the presentment requirement at best unclear. His theory is that the authority had a duty to enforce the rules of the way, and that it breached its duty, thereby creating a hazard in the way in the form of a speeding vehicle.

Despite the gloss that has attached by judicial decision to the phrase "a defect or a want of repair or a want of a sufficient railing in or upon a way," G. L. c. 84, § 15, we doubt that the phrase encompasses the plaintiff's allegations. In *Trioli* v. *Town of Sudbury*, 15 Mass. App. Ct. 394, 395-397 (1983), we agreed that the allegations of the plaintiff that the town, on notice that a stop sign was required at an intersection, negligently failed to erect such a sign, and that the plaintiff was injured when a motorist entered the intersection without stopping or yielding the right of way, stated the substance of a claim under G. L. c. 84, § 15 (thereby requiring notice under G. L. c. 84, § 18). In the present case, the claim is that the authority had a duty to prevent operation that it deemed to be unsafe, but that its infrequent enforcement of the speed limit breached that duty with resulting injury to the plaintiff. That does not appear to allege a defect in the way, even if, as in *Trioli*, the concept of a defect is expanded to include failures in designing the way or its appurtenances.

Nevertheless, we need not decide definitively whether presentment of the plaintiff's claim was required under G. L. c. 84, § 18, for, even if presentment were required and even if it were timely made, the evidence of negligence on the part of the authority was insufficient to avoid summary judgment. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991) (party

entitled to summary judgment if it demonstrates that party oppos-
ing motion has no reasonable expectation of proving essential
element of his case).

To sustain his negligence claim, the plaintiff was required to
demonstrate that the authority owed him a legal duty; that the
authority breached that duty; and that the breach of duty
proximately caused the plaintiff's injury. See *Davis* v. *Westwood
Group*, 420 Mass. 739, 742-743 (1995). Whether a duty exists
is a question of law. See *Yakubowicz* v. *Paramount Pictures
Corp.*, 404 Mass. 624, 629 (1989). A defendant may voluntarily
assume a duty even though no duty existed otherwise. See *Cot-
tam* v. *CVS Pharmacy*, 436 Mass. 316, 323-324 (2002). Here,
the authority created a system for managing taxicabs whose
drivers wished to operate at Logan Airport. To the extent that
the authority required the taxicabs to enter a particular area, the
authority was obliged to maintain that area in reasonably safe
condition and to warn of any dangers known to it that were not
apparent to visitors. See *Thorson* v. *Mandell*, 402 Mass. 744,
747 (1988); *O'Sullivan* v. *Shaw*, 431 Mass. 201, 204 (2000).
The plaintiff does not assert negligence on the authority's part
in either respect.[14] We conclude that there was no separate duty,
either imposed by law or voluntarily assumed, by which the
authority became an insurer of the plaintiff against the negligent
acts of others in the taxi pool. That the authority posted speed
limits as a means of controlling operations within the taxi pool
did not, on this record, constitute assumption of a legal duty to
enforce the restrictions in the interest of the plaintiff.

While the absence of a duty obviously ends the case, we
observe that, even were there a duty on the authority's part,
evidence that the authority breached that duty was scant at best.
The plaintiff relies on *Jesionek* v. *Massachusetts Port Authy.*,
376 Mass. 101, 106 (1978), wherein the authority itself created
a reasonably foreseeable danger by leaving a forklift unsecured
with keys in the ignition. The present case is quite different.
Here, the most that the plaintiff has shown is that the authority's
enforcement of the speed limit was inconsistent, a showing that
may well be insufficient to warrant a finding of negligence.

---

[14]As indicated, the plaintiff waived his count for failure to warn (count 8).

In addition, we doubt that the plaintiff has demonstrated that any breach of duty by the authority proximately caused him to be injured. See *Kent* v. *Commonwealth*, 437 Mass. 312, 320 (2002). The decision of Fenelus to leave the queue abruptly and speed into the travel lane, together with the fortuity that the plaintiff was crossing the travel lane at that moment, caused the accident. Indeed, given the instantaneous nature of the event, together with the absence of any showing that Fenelus, who had been present on only one previous occasion, knew of the authority's enforcement practices, a showing of proximate cause might well be impossible. In any event, it has not been made here.

We address the plaintiff's vicarious liability claims (counts 7 and 10). They are founded on a theory that the authority stood derivatively in the place of the taxi driver for purposes of tort liability. The plaintiff contends, in this regard, that Fenelus was the authority's contractor when he caused the injury. From this proposition, he argues that the authority is liable on two separate principles. First, he relies on Restatement (Second) of Torts § 428 (1965),[15] arguing that the authority operated as a public franchisee, and that Fenelus performed as the authority's contractor in carrying on the franchised activity. Second, the plaintiff asserts, in accordance with the Restatement (Second) of Torts § 414,[16] that the authority owed him a duty of care; that Fenelus performed work as an independent contractor, but the authority retained control over portions of the work; and that

---

[15]Section 428 states:

> "An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity."

The section reflects Massachusetts law on the subject, although the requirement that the "risk of harm" be "unreasonable" has not been adopted. See *Barry* v. *Keeler*, 322 Mass. 114, 126-127 (1947).

[16]Section 414 states:

> "One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

the plaintiff was injured by a negligent exercise of the authority's control.

In our view, the plaintiff's claims under these theories fail, if for no other reason, because there is no evidence that Fenelus was in fact the authority's contractor, independent or otherwise. The status of contractor ordinarily assumes the existence of a contract. See Restatement (Second) of Agency §§ 2(3), 14N. For purposes of tort liability, however, the category is not so narrow and encompasses "any person who does work for another" regardless of whether the work "is done gratuitously or is done for pay . . . ." Restatement (Second) of Torts § 409 comment a. Here, however, there has been no showing that the authority engaged in a contractual relationship of any kind with Fenelus, much less one that would impose derivative liability under the principles of the Restatement (Second) of Torts.

We assume for present purposes that the authority, desirous of getting people into and out of the airport, realizes a benefit from the availability of a class, i.e., taxi drivers, that conducts operations at that location. We acknowledge also that the authority exercises a modicum of control over those drivers by means of the taxi pool procedure. These factors fall considerably short of creating a contractual relationship between Fenelus and the authority. The authority did not deal with Fenelus or his representative; the terms were mandated, not negotiated; and Fenelus was free to provide the authority no service at all. We fail to see how there was a mutuality of obligation where one of the "contracting" parties was never required to do anything. In the absence of a status on the part of Fenelus as contractor (§ 428) or independent contractor (§ 414), the evidence was insufficient to support the plaintiff's claims under those sections.

4. *Conclusion.* The final judgment is affirmed as to counts 2 and 5 through 11 of the plaintiff's second amended complaint. Summary judgment is vacated and the final judgment is reversed as to counts 3 and 4.

*So ordered.*