NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-1152                                        Appeals Court


  SUSAN GALLAGHER  vs.  CEREBRAL PALSY OF MASSACHUSETTS, INC., &
                        others.[1]


                        No. 16-P-1152.

       Norfolk.     April 6, 2017. - September 13, 2017.

            Present:  Green, Blake, & Lemire, JJ.



MassHealth.  Massachusetts Wage Act.  Labor, Overtime
     compensation, Failure to pay wages.  Independent Contractor
     Act.  Regulation.  Practice, Civil, Motion to dismiss,
     Summary judgment.



     Civil action commenced in the Superior Court Department on
December 10, 2015.

     A motion to dismiss was heard by Rosalind Henson Miller, J.


     Paul L. Nevins for the plaintiff.
     Jeffrey S. Beeler for the defendants.


     LEMIRE, J.  Susan Gallagher, a personal care attendant

(PCA) who provided in-home services for an elderly man

_____

     [1] Donald Uvanitte and David Sprague.

(consumer[2]), brought an action in Superior Court against Cerebral Palsy of Massachusetts, Inc.; its president, Donald Uvanitte; and its treasurer, David Sprague (collectively, CPM), alleging that CPM was her employer and that it failed to pay her for her overtime hours, including failing to do so at an overtime rate. A judge granted CPM's motion to dismiss on the ground that, pursuant to the MassHealth regulations (regulations) governing Gallagher's work arrangement, she was employed by the consumer, not CPM. Gallagher appeals from the judgment, and we affirm.

Standard of review. Although there were exhibits attached to both CPM's motion to dismiss and Gallagher's opposition, the judge ostensibly declined to treat the motion as one for summary judgment, and she excluded the additional material from consideration. See Mass.R.Civ.P. 12(b), 365 Mass. 754 (1974). But in a footnote explicitly listing the excluded exhibits, the judge did not identify as having been excluded one of CPM's submissions: excerpts from a contract it executed with the Executive Office of Health and Human Services. That document establishes the applicability of certain of the regulations, including CPM's role within that regulatory framework as a

---

[2] The applicable regulations of MassHealth, the State-provided health insurance program, as they existed in 2006, used two terms: "member" and "consumer." 130 Code Mass. Regs. §§ 422.00 (2002). Although the latter is no longer in use following revisions effective as of 2017, our discussion will use both terms.

"fiscal intermediary," i.e., an entity that serves in a facilitative role with regard to payroll and related matters. 130 Code Mass. Regs. § 422.402 (2006).  These facts were not reflected in the complaint, but the judge cited them as dispositive.  By relying on facts outside of the complaint, the judge essentially rendered a decision in the nature of summary judgment.  Doucette v. Massachusetts Parole Bd., 86 Mass. App. Ct. 531, 533-534 (2014).

We will review the decision as such, including taking into consideration the other excluded material.  We may do so without risk of procedural unfairness for two reasons.  First, both parties in their briefs to this court addressed the implications of the facts reflected in the materials, compare Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004), and Gallagher's brief, in particular, argued that a summary judgment standard should have been applied.  Second, as we will explain further, we agree with the judge's conclusion that CPM was entitled to judgment as a matter of law; this result could not be overcome with further evidence.  "Accordingly, we review the judge's dismissal of this action as though [she] had granted a motion for summary judgment."  Cousineau v. Laramee, 388 Mass. 859, 860 n.2 (1983).

We review a grant of summary judgment de novo.  Federal Natl. Mort. Assn. v. Hendricks, 463 Mass. 635, 637 (2012).  In

doing so, we consider the pleadings and other record evidence, viewing them in the light most favorable to Gallagher and drawing all reasonable inferences in her favor, to determine whether, on the undisputed facts, CPM is entitled to judgment as a matter of law.  Ibid.

Background.  In June, 2006, Gallagher began working as a PCA, providing in-home care to the consumer, who received these services in connection with his MassHealth benefits.  Her work was facilitated, in part, by CPM.  Pursuant to the regulations governing PCA benefits for MassHealth members, CPM acted as a fiscal intermediary.  CPM's duties included forwarding notice of preapprovals, which were issued by MassHealth, for the number of hours of Gallagher's weekly work for which wages would be covered by MassHealth, issuing her paychecks, and making payments into the unemployment insurance system.

In September, 2006, shortly after beginning her work, Gallagher signed a form given to her by CPM, acknowledging that the consumer was her employer.  At approximately the same time, she signed two other forms given to her by CPM -- a W-4 form and an I-9 form.  Since that time, CPM has issued her annual W-2 forms.  Although these tax form interactions are commonly conducted with an employer, here, the W-4 and I-9 forms identified the consumer as the employer, and the single W-2 in the record states that it was issued by CPM "FBO [the

consumer]," i.e., for the benefit of the consumer. Additionally, CPM's role with respect to these tax forms was consistent with its duties under the regulations as a fiscal intermediary. See note 9, infra.

During the years she worked as a PCA, Gallagher sometimes worked more than forty hours per week, but she was not paid for any hours worked beyond forty per week. On December 10, 2015, Gallagher filed a verified complaint against CPM, including two of its officers, alleging violations of the Massachusetts Wage Act, see G. L. c. 149, § 148, and the Massachusetts overtime statute, see G. L. c. 151, § 1A. CPM responded with a motion to dismiss, which Gallagher opposed. As stated, both parties attached exhibits to their memoranda. On June 27, 2016, after a hearing, the judge granted CPM's motion on the ground that Gallagher was employed by the consumer, not CPM. Gallagher appeals.

Discussion. 1. Legal standard. The essential question posed by this case is whether CPM may be considered Gallagher's employer for the purposes of the Wage Act, the overtime statute, or both. Although the Wage Act contains two provisions that specifically expand the scope of the term "employer" in certain contexts,[3] neither the Wage Act nor the overtime statute includes

_____

[3] In particular, certain agents of a corporation "shall be deemed to be the employers of the employees of the corporation,"

a self-contained definition of "employer."  See G. L. c. 149, § 148; G. L. c. 151, § 1A.

Gallagher relies on Chase v. Independent Practice Assn., 31 Mass. App. Ct. 661, 665 (1991), and similar cases articulating various factors used at common law to distinguish employees from independent contractors.  These factors are "oriented toward determining whether an individual's conduct was subject to the principal's control or right of control."  Peters v. Haymarket Leasing, Inc., 64 Mass. App. Ct. 767, 774 (2005).  That inquiry, in turn, forms one of the "essential tests" used to determine the existence of an employment relationship at common law. Griswold v. Director of the Div. of Employment Security, 315 Mass. 371, 372 (1944).

While the common-law approach has continuing vitality in certain contexts, see, e.g., Peters, 64 Mass. App. Ct. at 773-774 (tort liability under respondeat superior), where the Wage Act and the overtime statute are concerned, the common-law approach has been superseded by G. L. c. 149, § 148B, which defines the over-all employer-employee relationship for all cases arising under G. L. c. 149 and G. L. c. 151.

---

and certain public officers are deemed to be employers of public employees.  G. L. c. 149, § 148, as appearing in St. 1956, c. 259.

Chapter 149, § 148B, creates a two-step inquiry. First, "[t]he threshold question is whether the [plaintiff] provided services to the [defendant]." Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 329 (2015). If this threshold is met, the individual is presumed to be an employee. Id. at 327. Under the second step, the putative employer may rebut that presumption by proving, pursuant to a three-part test, that the person worked as an independent contractor. Ibid.

We apply § 148B here by asking whether Gallagher provided services to CPM. Sebago, supra at 329. Ordinarily, this inquiry presents a question of fact. See id. at 331; National Assn. of Govt. Employees v. Labor Relations Commn., 59 Mass. App. Ct. 471, 474 (2003). This is not the ordinary case, however, because here there exists a regulatory framework that describes the relationship between the various parties -- Gallagher, CPM, and the consumer -- in extensive detail. See 130 Code Mass. Regs. §§ 422.00 (2002).

The fact that these regulations applied to Gallagher's work arrangement is confirmed by CPM's contract to act as a fiscal intermediary, as well as by several other exhibits, including many submitted by Gallagher herself. Importantly, for summary judgment purposes, there is nothing in the record to suggest that the regulations did not apply, nor that Gallagher's relationship with CPM differed in any respect from the

relationship, as contemplated by the regulations, between PCAs and fiscal intermediaries.  Equally important, looking to Gallagher's pleadings, there also are no allegations suggesting that her relationship with CPM differed in any way from that described by the regulations, much less that it differed by virtue of her providing services to CPM.  It is for this reason that we stated in our discussion of the standard of review that the result we reach could not be overcome with further evidence.

We thus look to the regulations to understand Gallagher's relationship with CPM and to determine whether she provided services to CPM.[4]

2.  <u>The regulations</u>.[5]  By the nature of their work, PCAs perform tasks for consumers.  These tasks include, for example, mobility assistance, bathing, dressing, meal preparation, laundering, grocery shopping, and general housekeeping.  See 130 Code Mass. Regs. §§ 422.402 (2002, 2006) (defining "Activities of Daily Living" and "Instrumental Activities of Daily Living" as being undertaken by, or with assistance from, PCAs); 130 Code

_____

[4] CPM points out that, at all relevant times, the regulations included a provision stating that "[t]he consumer is the employer of the PCA."  130 Code Mass. Regs. § 422.402 (2006) (defining "consumer").  We do not rely directly on that provision which, in any event, was removed recently, i.e., in a version effective May 5, 2017, the term "consumer" was removed. See 130 Code Mass. Regs. § 422.402 (2017).

[5] Hereinafter, we refer to the 2006 version of the Code of Massachusetts Regulations unless otherwise noted.

Mass. Regs. § 422.410(A)-(B) (specifying particular activities).

As a matter of law, consumers have the right to hire and to fire

their PCAs, to set their work schedules, to train them, and to

supervise them. 130 Code Mass. Regs. §§ 422.411(A)(1)(f),

422.420(A)(6).[6],[7]

Gallagher's relationship with CPM was of a markedly

different nature. Fiscal intermediaries such as CPM enter into

contracts with MassHealth "to perform employer-required tasks

and related administrative tasks." 130 Code Mass. Regs.

§ 422.402.[8] The definition of "employer-required tasks," in

turn, reflects the entities' role as strictly focused on

particular finance-related matters. Ibid. This includes

preparing PCA payrolls, generating and issuing paychecks,

managing certain tax-related matters (e.g., PCA income tax

withholdings and filing certain tax documents for members

---

[6] These particular rights are also guaranteed to consumers by G. L. c. 118E, § 73(a), a statutory provision found among a group of several that govern an entity known as the "PCA quality home care workforce council." G. L. c. 118E, § 70, inserted by St. 2012, c. 224, § 131.

[7] Until recently, some of these regulations were articulated as a precondition for MassHealth coverage. Under the 2017 version, however, the regulations are articulated as an eligibility requirement for PCAs wishing to work within the program. 130 Code Mass. Regs. § 422.404(A)(4)(d)(5) (2017).

[8] Following the revisions effective in 2017, the regulations more particularly specify that the fiscal intermediary operates under a contract with the Executive Office of Health and Human Services. 130 Code Mass. Regs. § 422.402 (2017).

receiving care),[9] paying into the unemployment insurance system, and purchasing workers' compensation insurance. Ibid. Although the fiscal intermediaries are responsible for issuing payments to PCAs, they act only as a conduit for funds that are provided by MassHealth. 130 Code Mass. Regs. §§ 422.411(A), 422.419(B)(12). Another regulation specifically provides that fiscal intermediaries are not responsible for paying PCAs for time worked in excess of what has been authorized by MassHealth, and the regulation does so with language that suggests that consumers would be responsible for payment of wages for that time. See 130 Code Mass. Regs. § 422.416(E)(4)(e).[10] Only MassHealth may approve the number of weekly hours for which it will cover payment of wages, including overtime.[11] See 130 Code Mass. Regs. §§ 422.416, 422.417, 422.418(A). Initial requests for preapprovals, as well as requests to adjust preapprovals, are made not by fiscal intermediaries, but by entities known as

---

[9] As we stated previously, CPM's involvement with Gallagher's W-2, W-4, and I-9 forms was consistent with its obligations as a fiscal intermediary. See 130 Code Mass. Regs. § 422.419(B)(11) (2017); 130 Code Mass. Regs. § 422.419(B)(13).

[10] The regulation states that fiscal intermediaries are not responsible for "reimburs[ing]" members for excess hours. 130 Code Mass. Regs. § 422.416(E)(4)(e).

[11] Among Gallagher's exhibits is a letter from CPM informing her that an adjustment in weekly PCA hours had been approved. The document is consistent with the regulations -- it is directed to the consumer, not to Gallagher, and it states that MassHealth, not CPM, issued the approval.

personal care agencies, in coordination with consumers, who may initiate such adjustment requests. 130 Code Mass. Regs. §§ 422.416, 422.417, 422.418(A). Rates of payment are set by regulation. 130 Code Mass. Regs. § 422.448.

Nothing in these regulations suggests that PCAs provide services to fiscal intermediaries. While it is true that the very existence of PCAs does eventually inure to the benefit of fiscal intermediaries -- MassHealth pays fiscal intermediaries "administrative fee[s]" for their work, 130 Code Mass. Regs. § 422.448 -- there are two reasons why this does not alter our conclusion.

First, CPM's entitlement to administrative fees is the result of a work arrangement that was designed by Congress, the State Legislature, and regulatory agencies -- not CPM.[12] As in

---

[12] The program in which the parties participate is a Medicaid funded program providing in-home services to elders who qualify for services under the Federal Medicaid statute. See 42 U.S.C. § 1396 (2012). The program is governed by a "labyrinth" of Federal and State statutes. Daley v. Secretary of the Executive Office of Health & Human Servs., 477 Mass. 188, 189 (2017). "Although the Medicaid program is voluntary for States, participating States must comply with certain requirements imposed by the [Federal Medicaid statute] and regulations promulgated by the [United States] Secretary [of Health and Human Services] through [the Centers for Medicare and Medicaid Services]." Id. at 190. Massachusetts has voluntarily adopted a State Medicaid program known as MassHealth, see note 2, supra, which was established pursuant to G. L. c. 118E, § 9, to comply with the Federal Medicaid statute. The relationships between the parties here are a product of the Federal-State partnership, the Federal mandate, and the implementing statute and regulations.

Sebago, which also involved a highly regulated industry, "[t]his is not a case of defendants concocting an artificial . . . scheme to circumvent the wage laws."  471 Mass. at 330.  Nor is this "a case of [an employer] creating a false dichotomy between the administrative and operational aspects of [its] business." Ibid.  The administrative fees do not reflect an effort by CPM to make an "end run" around our wage and hour laws.  DePianti v. Jan-Pro Franchising Intl., Inc., 465 Mass. 607, 624 (2013).

Second, focusing our attention more directly on the threshold test under § 148B, we conclude that the relationship between Gallagher's work and CPM's receipt of administrative fees is far too attenuated to permit the conclusion that she provided services to CPM.  This aspect of the parties' relationship is similar to that between taxicab drivers and the taxicab garage in Sebago, supra at 331.  Gallagher did not provide services to CPM, much as the drivers did not provide services to the taxicab garage; rather, like the garage, which catered to the taxicab industry "as a whole," CPM received administrative fees by virtue of the facilitative services it provided to this MassHealth program as a whole.  Ibid.

We therefore conclude that, in the circumstances of this case involving a PCA and fiscal intermediary working wholly within the framework of the regulations, Gallagher did not

provide services to CPM and cannot be deemed its employee for the purpose of the Wage Act or the overtime statute.

3. Joint employment. Gallagher posits that, even if another person or entity was her employer,[13] CPM was her joint employer.[14] "The Supreme Court defined the concept of a 'joint-employer' as a company possessing 'sufficient control over the work of the employees' of another company." Commodore v. Genesis Health Ventures, Inc., 63 Mass. App. Ct. 57, 61 (2005), quoting from Boire v. Greyhound Corp., 376 U.S. 473, 481 (1964). "The basis of [a joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." Id. at 62, quoting from Swallows v. Barnes & Noble Book Stores, Inc., 128 F.3d 990, 993 n.4 (6th Cir. 1997). As with the existence of an employment

---

[13] She specifically identifies the consumer as the employer, consistent with the judge's conclusion. For present purposes, however, we need not address whether that conclusion was correct.

[14] In her brief, Gallagher identified MassHealth as the entity that may have been her joint employer. We do not address the question whether MassHealth may be her joint employer, as Gallagher brought claims against CPM, not MassHealth, who is not a party to this litigation. As best we can discern, it appears that Gallagher intended to press a theory that CPM was her joint employer. We therefore construe her argument as such, rather than simply reject it as irrelevant.

relationship, or the distinction between employees and independent contractors, joint employment is ordinarily a question of fact.  Id. at 61-62, citing Boire, supra.

We need not address whether the statutory "provision of services" test in § 148B supplants the common-law "right to control" test for purposes of a joint employment theory of liability under the Wage Act or the overtime statute. Gallagher's theory fails under the statutory test, for the reasons already set forth; and it fails under the common-law approach because the regulations we described further reflect that CPM, unlike the consumer, had no right to control Gallagher's work.[15]

Conclusion.  Although fiscal intermediaries play an important role in MassHealth's regulatory framework, their

---

[15] In the context of her right to control argument, Gallagher noted that the consumer she cared for was "non-compos mentis."  It is not clear on this record whether the consumer appointed a surrogate agent to make decisions on his behalf, as contemplated by the regulations.  See 130 Code Mass. Regs. §§ 422.422(B)(1) (members appoint their surrogates); 422.402 (PCA is "hired by the member or surrogate").  See also 130 Code Mass. Regs. §§ 422.411(A)(1)(f) (PCA must be "willing to receive training and supervision . . . from the member or the member's surrogate"); 422.416(B) (consumer or surrogate may request adjustment to prior authorizations for weekly hours covered by MassHealth); 422.422(A)(1)(b) (when beginning services, member is assessed to determine need for surrogate).  In any event, even under the common-law approach, "[i]t is the right to control, as opposed to actual control, that is determinative." Peters, 64 Mass. App. Ct. at 774.  This principle has particular relevance here because this matter involves a highly regulated set of relationships.

"[m]ere participation in that system is insufficient" to render them presumptive employers under G. L. c. 149, § 148B(a). Sebago, 471 Mass. at 330. Because Gallagher did not provide services to CPM, it cannot be deemed her employer for the purposes of the Wage Act, nor the overtime statute, and her claims were correctly dismissed.[16,17]

Judgment affirmed.

---

[16] We do not reach the question whether a PCA would have a claim sounding in contract against a fiscal intermediary if the latter were to improperly withhold, from both the PCA and the member, wages for work performed where the number of hours did not exceed those approved for coverage under a MassHealth prior authorization.

[17] We deny CPM's request for appellate attorney's fees.