Locke, Jeffrey A., J.

INTRODUCTION

This action arises out of a dispute over two term life insurance policies (“the Policies”) issued to Neil Grant (“Grant”), by the defendant, Fidelity & Guaranty Life Insurance Company (“Fidelity”). Grant named his daughter, plaintiff, Wendy Gray (“Gray” or “Wendy”), as a beneficiary under the Policies. Gray filed a complaint against Fidelity for breach of contract.
Specifically, Gray alleges that Fidelity failed to pay her the proceeds of the Policies following Grant’s death. Fidelity contends that it lawfully rescinded the Policies on the grounds that Grant had made material misrepresentations about his medical history on both applications. Presently before the court is the Defendant’s Motion for Summary Judgment. For the following reasons, the defendant’s motion is DENIED.

BACKGROUND

Fidelity is a foreign corporation with its principal place of business in Baltimore, Maryland. Fidelity is licensed to transact business in Massachusetts. Wendy Gray is a Massachusetts resident. Neil Grant was a Florida resident. During two separate visits to Massachusetts, Grant purchased a life insurance policy through Sean Gray (“Sean Gray” or “Sean”), a Massachusetts resident and insurance broker licensed only to sell insurance in Massachusetts. Fidelity issued two life insurance policies, numbered 1-001441421 and 1-001448432, each in the amount of $50,000 on the life of Neil Grant. The first policy was issued on September 13, 2001 and named Grant’s children, Wendy Gray and Christopher Grant, as equal beneficiaries. The second policy was issued on July 15, 2002 and named Wendy Gray as the primary beneficiary and Christopher Grant as the contingent beneficiary. Grant died in North Carolina on October 19, 2002.

I. The Application Process

On August 12, 2001, Grant completed the first of two applications for life insurance while visiting his daughter, Wendy, in Rutland, Massachusetts. At the time of his first application, Grant was 60 years old and resided in Pine Key, Florida. Grant listed his main residence on both applications as 209047 Palmetto Drive. Grant had lived and worked in Florida for approximately 30 years. Over the years, Grant worked as a fishing boat captain on the Florida Keys with the exception of two months each summer which he spent managing a parking lot in New Hampshire that he co-owned with his brother. Prior to going to New Hampshire, Grant usually spent a week or two visiting Wendy in Massachusetts.
During a visit to Wendy in the summer of 2001, Grant spoke to his son-in-law, Sean Gray, an insurance broker, about obtaining term life insurance. Grant wanted life insurance in order to pay off a mortgage on his Florida home in the event of his death. At that time, Sean was separated from his wife, Wendy. Sean, who was licensed to only sell insurance in Massachusetts, agreed to take Grant’s application for insurance. As part of standard practice, Sean read each and eveiy question on the application to Grant and recorded each of Grant’s responses on the application. The application was three pages long. At his deposition, Sean testified that he did not recall Grant having any questions or appearing confused by any of the application’s questions. After the application was completed, Sean reviewed the entire application with Grant and then both of them signed it. Grant also provided Sean with a $90.00 check to cover the initial premium deposit.

II. The Application

Two of the questions Grant answered in the first application concerned his medical history. Questions 7 and 8 on the application, respectively, asked the following:
Within the past 10 years, has any person proposed to be insured been treated for or diagnosed by a physician or other healthcare professional as having: a. Any disorder or disease of the blood or circulatory system (such as: heart disease, palpitations, rheumatic fever, heart murmur, angina or chest pain, high blood pressure, stroke, anemia), *650 respiratory system (such as: emphysema, tuberculosis, asthma, bronchitis), . . . urinary tract (such as: kidney or bladder,), . . . liver ... or muscles or bones (such as: arthritis, gout, back problems)?
Within the past five years, has any person proposed to be insured: a. Been in the hospital . . . seen a doctor, or been advised to and not done so? b. Had electrocardiogram, x-ray, or other diagnostic tests, or been advised to and not done so? c. Been or is now disabled, or had or now have any other mental or physical disorder not listed?
Questions 7 and 8, Insurance Application. (Emphasis added.)
In response to Questions 7 and 8, Grant disclosed that (1) he had been diagnosed with arthritis in his neck in 1991; (2) he took Ultram, 50mg. 1-4 times a day, and (3) he had a physical in June 2001 in which he was 100% fine. Grant also identified Dr. Lofland as his personal physician. Grant signed the application and certified to the following:
The statements made in this application: are complete; true; and correctly recorded. I agree that a copy of this application will form part of any policy issued; and that no agent can pass on insurability or modify any policy issued by the Company.
Certification Statement, Insurance Application
The policy also contained Fraud Warning Notices, which neither Grant nor Sean Gray signed.
Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.
The policy, however, did not contain a forum selection clause. Further, there is no language in the policy indicating that Florida law governed any dispute or litigation resulting from the Policies.
On September 13, 2001, Fidelity issued Grant a life insurance policy in the amount of $50,000 without a medical examination. Fidelity sent the original policy to Sean in Massachusetts for delivery to Grant.
The following year, on June 15,2002, Grant applied for a second policy from Fidelity. Grant completed his second application during a four- to six-day visit to Wendy with Sean’s assistance. Sean followed the same procedure as he had done during Grant’s first application. For his second application, Grant provided identical responses that he had in 2001 with respect to questions about his health and medical history. Grant also made the same certification in his application and provided a $197.00 check for the initial premium deposit. On July 15, 2002, Fidelity issued a second policy to Grant in the amount of $50,000 without a medical examination. Once again, Fidelity-sent the original policy to Sean for delivery to Grant.
A few months later, on October 19, 2002, Grant died in North Carolina. Grant’s death certificate listed his cause of death as progressive respiratory failure. Shortly thereafter, Wendy Gray filed her claim for death benefits under the Policies. Grant’s estate was probated in Florida after his death.

III. The Investigation

After Grant’s death, Fidelity conducted an investigation of Grant’s medical history. Fidelity discovered that Grant had suffered from a multitude of health problems, which he did not disclose on either of his applications. These health problems included: (1) recurrent episodes of prostatitis; (2) long-standing back pain and Vicodin treatment; (3) high blood pressure and hypertension; and (4) chronic obstructive pulmonary disease (“COPD”). Fidelity also learned that Grant failed to disclose that he had undergone a series of diagnostic tests leading up to his first and second application. Fidelity discovered additional misrepresentations that Grant had made concerning his mortgage status. On his first application, Grant signed a Mortgage Certification Form stating that he had taken out a mortgage on his home within the last 13 months of his application. Fidelity later learned that Grant had not, in fact, taken out a mortgage within the prescribed period, but rather four years prior to his application. Grant also made a similar misrepresentation on his second application.[1]
Based on these findings, Fidelity denied coverage because Grant had made material misrepresentations of fact in the applications, which resulted in an increased risk of loss to the company. Fidelity now moves for summary judgment.

DISCUSSION

I. Summary Judgment Standard

Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat a motion for summary judgment. Pederson v. Time, Inc., 404 Mass. 404 at 17. *651 The opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). All the evidence must be viewed in the light most favorable to the non-moving party. Williams v. Hartman, 413 Mass. 398, 401 (1992).
A. Determination of Applicable State Daw
As an initial matter, the parties disagree as to which state’s law should apply to plaintiffs claim. Fidelity argues that Florida law applies and that the Policies are unenforceable under Florida Statute §627.409(1). Specifically, Fidelity contends that §627.409(1) permits rescission of a life insurance policy on the basis of material misrepresentations or omissions made in an application for life insurance, such as in this case. In her opposition, Wendy Gray contends that Massachusetts law governs and as such the Policies are in full effect because Fidelity has not shown that Grant’s misrepresentations were “willfully false, fraudulent or misleading” under G.L.c. 175, §124. The Policies themselves do not include forum selection clauses; thereby leaving this question to be resolved by the court.
To resolve the choice of law question, the court relies primarily on Section 6 of the Restatement (Second) of Conflict of Laws and the choice of law principles applicable to all substantive contract issues. In the absence of a choice of law by the parties, their contractual rights are determined by the local law of the state which, with respect to the issue at hand, has the most significant relationship to the transaction and the parties. Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622, 632 (1985), quoting Restatement (Second) of Conflict of Laws §188(1) (1971).
The contacts to be taken into account in applying the principles of §6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (e) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties. Bushkin, 393 Mass. at 632, quoting Restatement (Second) of Conflict of Law §188(2). Factors under §6 that are said to be relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. Id.
Applying these parameters to the facts of this case, the court finds that although a close question, Massachusetts law controls because it has the most significant relationship to the present action. Several factors favoring the application of Florida law include: (1) Grant was a long-time though not full-time, resident of Florida; (2) Grant listed a Florida address as his primary residence in both applications; and (3) Grant’s estate was probated in Florida. However, these factors are outweighed by Massachusetts’ greater interest in adjudicating disputes over life insurance policies sold in Massachusetts under authority of a Massachusetts licensed broker. As well, all of the major transactions concerning the applications for issuance of the Policies occurred in Massachusetts. For instance, the Policies were applied for and sold in Massachusetts by Sean Gray, an insurance agent licensed to only sell insurance in Massachusetts. Sean Gray had no authority to issue Florida life insurance policies. The Policies also list Wendy Gray, a Massachusetts resident, as a beneficiary. Moreover, after Fidelity approved of Grant’s applications, it sent the original policies to Sean Gray in Massachusetts for delivery to Grant. The fact that Grant, a Florida resident, had intentionally applied for life insurance in Massachusetts on two separate occasions when he presumably had the opportunity to do so in Florida further suggests that the parties involved reasonably expected Massachusetts law to apply.[2] Lastly, Fidelity’s failure to include a choice of law clause in the Policies must be construed against Fidelity as the drafter of the clause under relevant contract principles. Hazen Paper Co. v. U.S. Fidelity and Guar. Co., 407 Mass. 689 (1990) (ambiguities in an insurance contract are construed in favor of the insured); Slater v. United States Fidelity & Guar. Co., 379 Mass. 801, 804 (1980); Palmer v. Pawtucket Mut. Ins. Co., 352 Mass. 304, 306 (1967); MacArthur v. Massachusetts Hosp. Serv., Inc., 343 Mass. 670, 672 (1962). As the more sophisticated contracting party, Fidelity easily could have included a choice of law clause but it failed to do so. Accordingly, this court will apply Massachusetts law.

B. Merits of Fidelity’s Summary Judgment Motion

G.L.c. 175, §124 provides, in relevant part:
In any claim arising under a policy issued in the commonwealth by any life insurance company, without previous medical examination, or without the knowledge and consent of the insured, or, if said insured is a minor, without the consent of the parent, guardian or other person having legad custody of said minor, the statements made in the application as to the age, physical condition and family history of the insured shall be held to be valid and binding on the company; but the company shall not be debarred from proving as a defense to such claim that said statements were wilfully false, fraudulent or misleading.
Id. (emphasis added).
In the present case, it is undisputed that Fidelity-issued the Policies to Grant without a medical exami *652 nation. Therefore, Fidelity bears the higher burden of establishing that statements made by Grant were “wilfully false, fraudulent, or misleading.” Although Grant signed the Policies and certified that the statements were true, this court cannot find, as a matter of law, that the misrepresentations made by Grant in his applications were “wilfully false, fraudulent, and misleading.” In Robinson v. Prudential Ins. Co. of America, the Massachusetts Court of Appeals determined that absent a medical examination, the question of whether an insured’s statements were “wilfully false, fraudulent, or misleading” could not be determined on summary judgment. 56 Mass.App.Ct. 244, 251 (2002), quoting, Sullivan v. John Hancock Mut. Life. Ins. Co, 342 Mass. 649, 655-56 (an incorrect statement does not necessarily indicate an intent to deceive). Furthermore, the Robinson court precisely stated that the issue of intent to deceive is a jury question. Id. Accordingly, defendant’s motion for summary judgment is denied.

ORDER

For the reasons set forth above, it is hereby ORDERED that Fidelity’s motion for summary judgment be DENIED.

 Fidelity claims the mortgage statuses were false and material because the term life insurance policies that Grant applied for were a special offering to new homebuyers.

This court acknowledges that although Sean was Grant’s son-in-law, he was actually separated from Wendy at the time Grant applied for both policies, a fact, which seemingly dispels concerns over collusion or inappropriate behavior by the parties.